Death Opinion














IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-76,620





 

EX PARTE LEMMUEL NIVEK HATCHER, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


CAUSE NO. 16292B IN THE 104TH DISTRICT COURT


FROM TAYLOR COUNTY






 Cochran, J., delivered the opinion of the Court in which Meyers, Price,
Womack, Johnson, Keasler, Hervey and Alcala, JJ., joined. Keller, P.J.,
concurred.


 A jury convicted applicant of possession with the intent to deliver cocaine, and the
trial judge sentenced him to thirty years in prison. The Eastland Court of Appeals affirmed
his conviction. (1) Applicant then filed an application for a writ of habeas corpus under Article
11.07, in which he contends that his counsel rendered ineffective assistance at trial-under
either the Strickland or Cronic standard-because he (1) failed to prepare for trial, (2) elicited
prejudicial testimony from applicant's mother, (3) failed to request an accomplice-witness
instruction, and (4) delivered an improper closing argument. Applicant also contends that
counsel rendered ineffective assistance on appeal because he failed to argue that the
non-accomplice evidence was insufficient to connect applicant to the commission of the
offense.

 We twice remanded this application and requested that the convicting judge make
specific findings and determine if trial counsel was ineffective for any of these reasons. (2) 
The convicting judge filed findings and recommended that relief be denied. Because those
findings are supported by the record, we will adopt them and deny relief.

I.

 Applicant lived with Antonio Fuentes and Brandi Hyke. The police obtained a search
warrant naming applicant as a drug-trafficking suspect. When nine narcotics agents executed
the warrant, applicant and Mr. Fuentes were at home. The police found electronic scales, a
box of plastic sandwich bags, hydrocodone pills, a pill bottle without a label, and 16 grams
of well-hidden cocaine. (3) They also found a notebook in which the entries divided the rent,
utilities, and payments for a washer and dryer into thirds. In applicant's bedroom they found
a black bag with a trace amount of cocaine in it.

 Applicant was charged with possession of cocaine (4 to 200 grams) with the intent to
deliver, a first degree felony. (4) The indictment also alleged that applicant had committed this
offense in a drug-free zone and had been previously convicted of aggravated assault, making
his punishment range 20 to 99 years or life. (5) Before applicant's trial, Ms. Hyke pled guilty
to the same offense in exchange for six years' deferred adjudication. She agreed to be
"debriefed by the lead investigator Tommy Pope, and [to] be available to testify against both
[applicant] and Mr. Fuentes whenever their cases went to trial."

 At trial, Ms. Hyke testified that she first became friends with Mr. Fuentes because
they worked together. She met applicant later because he was Mr. Fuentes's roommate at
a house on Grand Street. She saw the two men deal drugs from the Grand Street house. 
Later, the three rented a house together on Laurel Street. Applicant and Mr. Fuentes
continued to deal cocaine. They hid it "rolled up in the newspaper in the living room" and
in "the gutter outside, the rain gutter" and in "a bean bag chair behind the couch." Ms. Hyke
observed applicant take part in "probably a hundred transactions" at the two houses. (6) Mr.
Fuentes was involved in "about half" of those drug sales. Ms. Hyke also made a handful of
deliveries for both men, and once counted out $4,300 cash when the men bought more
cocaine from their supplier. Trial counsel did not request, and the trial court did not give, an
accomplice-witness instruction concerning Ms. Hyke's testimony. In closing argument,
counsel conceded that the roommates were drug dealers, but he focused on the State's failure
to prove that applicant, rather than Mr. Fuentes, possessed the very cocaine that was found
during the search. 

 On appeal, applicant was represented by the same attorney as at trial. II.

A. The Strickland Standard

 A defendant has a Sixth Amendment right to effective assistance of counsel. To
obtain habeas corpus relief for ineffective assistance of counsel under Strickland v.
Washington, an applicant must show that (1) counsel's performance was unconstitutionally
deficient, and (2) "there is a 'reasonable probability'--one sufficient to undermine
confidence in the result--that the outcome would have been different but for his counsel's
deficient performance." (7)

 There "are countless ways to provide effective assistance in any given case," so a
reviewing court must be highly deferential and "indulge a strong presumption that counsel's
conduct falls within the wide range of reasonable professional assistance; that is, the
defendant must overcome the presumption that, under the circumstances, the challenged
action might be considered sound trial strategy." (8) Strategic or tactical decisions are not
deficient "unless the challenged conduct was 'so outrageous that no competent attorney
would have engaged in it.'" (9) To establish prejudice, one must show "that counsel's errors
were so serious as to deprive defendant of a fair trial, a trial whose result was reliable." (10) 

 The applicant has the burden to prove ineffective assistance of counsel by a
"preponderance of the evidence." (11) His allegations of ineffectiveness must be based on the
record, and the presumption of a sound trial strategy will generally not be overcome in the
absence of evidence of the attorney's reasons for his conduct. (12) "The reviewing court must
look to the totality of the representation, and its decision must be based on the facts of the
particular case, viewed at the time of counsel's conduct so as to eliminate hindsight bias." (13) 
The "ultimate focus of inquiry must be on the fundamental fairness of the proceeding." (14)

 The Sixth Amendment also entitles a criminal defendant to effective assistance of
counsel when pursuing a first appeal of right. (15) In assessing the effectiveness of appellate
counsel, we apply the test set forth by the Supreme Court in Strickland v. Washington. (16)

B. The Cronic Standard

 In United States v. Cronic, (17) the United States Supreme Court recognized a limited
exception to Strickland, holding that "if counsel entirely fails to subject the prosecution's
case to meaningful adversarial testing, then there has been a denial of Sixth Amendment
rights that makes the adversary process itself presumptively unreliable." (18) That is, "Cronic
held that a Sixth Amendment violation may be found without inquiring into counsel's actual
performance or requiring the defendant to show the effect it had on the trial when
circumstances exist that are so likely to prejudice the accused that the cost of litigating their
effect in a particular case is unjustified." (19) For Cronic to apply, however, the attorney's
failure to test the prosecutor's case "must be complete." (20) Courts have found this complete
failure in the situation where counsel is physically present but mentally absent. (21) Courts have
sometimes found this complete failure where counsel abandons his client in closing argument
by conceding his guilt. (22)

C. Standard of Review

 This Court is the ultimate factfinder in habeas corpus proceedings. (23) The trial judge
on habeas is the original factfinder-the "collector of the evidence, the organizer of the
materials, the decisionmaker as to what live testimony may be necessary, the factfinder who
resolves disputed fact issues, the judge who applies the law to the facts, enters specific
findings of fact and conclusions of law, and may make a specific recommendation to grant
or deny relief." (24) We will usually defer to and accept a trial judge's findings of fact when
they are supported by the record. (25) When our independent review of the record reveals that
the trial judge's findings and conclusions are not supported by the record, we may exercise
our authority to make contrary or alternative findings and conclusions. (26)

III.

A. Applicant Has Failed to Prove that Counsel Was Constitutionally Deficient. 

1. Applicant has failed to prove, by a preponderance of the evidence, that trial counsel
was constitutionally deficient in his preparation for trial.

 Applicant asserts that trial counsel's admitted lack of preparation resulted in multiple
errors at trial. He states that counsel's "failure to investigate my case did not allow for the
development of any viable defense theory and limited him to defense by cross-examination." 
Applicant argues that his attorney's "failures and omissions must be deemed deficient and
allow a presumption of prejudice." He argues that his counsel's failure to prepare amounted
to ineffective assistance under either or both Strickland and Cronic.

 Counsel's function "is to make the adversarial testing process work in the particular
case." (27) Accordingly, competent counsel must "conduct independent legal and factual
investigations sufficient to enable him to have a firm command of the case and the
relationship between the facts and each element of the offense." (28) "When trial counsel does
not conduct a complete investigation, his conduct is 'reasonable for purposes of ineffective
assistance of counsel only to the extent that reasonable professional judgments support the
limitations on investigation.'" (29) A particular choice not to investigate should be judged for
its reasonableness under all of the circumstances, applying a "heavy measure of deference"
to counsel's judgments. (30) A breach of the duty to investigate may result in a finding of
ineffective assistance "where the result is that any viable defense available to the accused is
not advanced." (31)

 On the morning of trial, counsel sought a continuance. In presenting that motion, he
said that he had not prepared to try the case because he believed that applicant would accept
the State's favorable plea offer, and he did not want that offer revoked:

 My goal with this case, at least with the psychology of plea negotiations with
the State is, number one, not to ask for a discovery response, and, number two,
not to get ready for trial, because in getting ready for trial, I start to call people,
that gets back to the District Attorney's office, they find out I'm getting ready
to go [to] trial, and then the plea offer that's below the minimum disappears. (32)

 Counsel stated, "I'm not ready to try this case. I think that a trial at this point would
be a rubber stamp. The State would call in their witnesses, the jury would deliberate about
an hour, and he would be convicted." In denying the motion for continuance, the trial court
noted that (1) the case had been pending for over a year; (2) it had been set for trial on
numerous occasions, and (3) the parties were twice notified, in open court, of the current
setting. A jury was empaneled, and then the court adjourned for the day. The next morning,
trial counsel acknowledged, and the trial court found, that the State "has either complied with
the [trial court's] standard discovery order or will comply with the standard discovery order."

 In his affidavit responding to applicant's writ allegations, trial counsel stated that he
believed the State's plea offer was a good one and that Mr. Hatcher should have accepted
that offer, but "[s]imply because I did not ask for a discovery order, does not mean that I did
not prepare for and was not prepared for trial." (33)

 Trial counsel then set out what he did in preparing for trial: he met with his client five
times, met with prosecutors four times, and had a number of conversations with the federal
investigator who was gathering evidence for a possible federal indictment against applicant. 
He obtained, via informal discovery, everything that formal discovery would have uncovered,
and then some, (34) and he did so "without losing the State's 15 year offer." Counsel explained
that if he had asked for discovery, the offer would have gone up to 20 years. 

 The trial judge detailed these actions in his findings, (35) and he also found that

 Counsel's questioning of witnesses, his evidentiary objections, and his
arguments to the court and judge were logical, cogent, and effective. During
the trial and punishment hearing, counsel seemed familiar with the facts and
the law pertaining to the charge. . . . Applicant's trial counsel was prepared for
trial and the punishment hearing.

 The trial judge's findings are supported by the record. In spite of counsel's desire for
a continuance for more preparation time, trial counsel did prepare for trial. He did so in a
manner that kept the advantageous plea offer in place. When applicant rejected this plea
despite counsel's advice, his attorney did a reasonable job with the hand he was dealt.
Applicant does not point to any viable defenses that more investigation would have
uncovered. Though no obvious theory of defense was available, applicant's decision to go
to trial was honored, and his attorney held the prosecution to its heavy burden of proof. (36) 
Even now applicant does not suggest a more successful strategy. As a reviewing court, we
will not second-guess counsel's reasonable trial strategy. But even if we assumed that
counsel's actions fell below the objective standard of reasonableness, applicant has not
established that a different result likely would have occurred had counsel acted differently.
We cannot, therefore, conclude that trial counsel's actions prejudiced applicant, much less
do they call for presumed prejudice under Cronic because those actions are not so deficient
as to equal no representation at all. (37)

2. Applicant has failed to prove, by a preponderance of the evidence, that trial counsel
was constitutionally deficient for purportedly "opening of the door" to evidence of
applicant's prior jail and prison incarceration.

 Applicant contends that trial counsel elicited from his mother that he had been in jail
and prison-and so opened the door to evidence of applicant's prior jail and prison
incarceration. (38) 

 Counsel's questioning of applicant's mother, Shelah Hatcher, got off to a bad start:

Q: Mrs. Hatcher, I've spoken with you briefly, but I'm Sam Mehaffey. I'm your son's
attorney in this matter, and he's charged with possession with intent to distribute in
a drug-free zone. The allegation is that this occurred on or about July 31st of 2006,
and what I'm going to show you right now is a calendar, a 2006 calendar. It's got the
year, the month of July, and the month of August, if that helps in anyway.

 . . .

 Your son, Nivek, how long has he lived in the Abilene area?


A: All his life, except when he was incarcerated.


Counsel did not object, but he tried to steer the conversation back on the right track:

Q: Okay. How old is he?

A: 25.

Q: Okay. And he-do you remember where he was living on or about July 31st, 2006?

A: Nivek has always lived with either me or my mother.

 Later, Mrs. Hatcher gave another non-responsive and unhelpful answer: "Like I said,
ever since he got out from being incarcerated, either I would see him every day or every
night, you know, either going to work or getting ready for work or whatever." After some
cross-examination on dates-and whether applicant took out student loans prior to his being
incarcerated, trial counsel directly addressed applicant's prior prison term.

Q: . . . Now, when your son was sent to prison, the date of that document indicates 2001. 
Does that sound right? Not when he got out, but when he went, 2001?

Mrs. Hatcher couldn't answer that question, but she later interjected,

A: Like I said, he was released to Mother. He stayed at Mother's . . . . And every so
often I would see him in the yard talking to his parole officer, whatever.


Mrs. Hatcher was decidedly not helpful in her unresponsive answers.

 In his writ affidavit, counsel states that 1) he was trying to show that applicant was
not living at the Laurel Street house at the time the search warrant was executed, but was
living with his mother, 2) applicant's mother was fully aware of the scope and the type of the
testimony that he was trying to elicit from her, and 3) no one "could have anticipated that she
would state to the jury that her son was incarcerated." Once "the cat was out of the bag,"
trial counsel stated that he did everything he could to "explain the situation and to minimize
the negative impact that the statement would have on the jury."

 The trial court found that trial counsel did not elicit this information. This finding is
clearly supported by the record. Mrs. Hatcher volunteered several non-responsive answers. 
Trial counsel did not object to these statements as non-responsive, as he could have, but a
non-responsive answer alone does not open the door to a full inquiry by the State of a
defendant's prior experience with the criminal justice system. (39) And the State did not attempt
any such inquiry. We will not second-guess trial counsel's decision to "explain the situation"
rather than object, (40) but even if we assumed that counsel's handling of Mrs. Hatcher fell
below the objective standard of reasonableness, applicant has not established that the jury
might well have found him not guilty had counsel acted differently. We therefore cannot
conclude that trial counsel's actions resulted in any prejudice to applicant.

3. Applicant has failed to prove, by a preponderance of the evidence, that there is a
reasonable probability that the outcome of his trial would have been different but for
trial counsel's failure to request an accomplice-witness instruction.

 Applicant contends that trial counsel should have requested an accomplice-witness
instruction on Brandi Hyke. Had the jury been so instructed, he argues, there is a reasonable
probability that he would have been found not guilty.

 Under Article 38.14, "A conviction cannot be had upon the testimony of an
accomplice unless corroborated by other evidence tending to connect the defendant with the
offense committed; and the corroboration is not sufficient if it merely shows the commission
of the offense." (41) A witness who is indicted for the same or a lesser-included offense as the
accused is an accomplice as a matter of law. When there is no doubt that a witness is an
accomplice as a matter of law, the trial judge must instruct the jury accordingly. (42) 
Corroborating evidence under Article 38.14 need not be sufficient, standing alone, to prove 
that a defendant committed the offense. "All that is required is that there is some
non-accomplice evidence tending to connect the defendant to the offense." (43) 

 Defense counsel's failure to request an instruction on accomplice-witness testimony
may constitute ineffective assistance of counsel. (44)

 Before applicant's trial, Ms. Hyke pled guilty to the same offense applicant was on
trial for; she was, therefore, an accomplice as a matter of law.

 In his affidavit responding to applicant's writ allegation, trial counsel wrote: 

 I did not request an accomplice witness instruction. I believed that [Ms. Hyke's]
testimony was extremely believable and credible to the jury. I did not believe that
requesting an accomplice instruction was beneficial because it would bring attention
to her testimony. The accomplice instruction, in my opinion, gives the jury the
impression that they can convict if the jury finds that there is corroborating evidence,
without looking at beyond a reasonable doubt. [Ms. Hyke's] testimony was
corroborated by the fact that the drugs were found in the house when the search
warrant was executed, and Mr. Hatcher was specifically named in the search warrant.
This was not a case in which the co-defendant was the sole witness and supplied all
of the evidence regarding the offense. The drugs were found in the house and Mr.
Hatcher was specifically named in the warrant.

 The trial court found that trial counsel intentionally decided not to request an
accomplice-witness instruction; "this was not an oversight on his part." The trial court also
made findings that listed the "non-accomplice evidence connecting applicant to the offense."

 Intentional or not, trial counsel's failure to request an accomplice-witness instruction
on the State's star witness was deficient conduct. Regardless of whether counsel deemed Ms.
Hyke believable, she was an accomplice as a matter of law, and, under Article 38.14, a
conviction could not be had upon her testimony unless it was corroborated by other evidence. 
Applicant was entitled to the instruction, and it could only have benefitted the defense. (45) 
Nonetheless, that failure did not create a reasonable probability that the result of the trial
would have been different had counsel asked for an accomplice instruction, (46) because ample
other evidence "tended to connect" applicant to the offense:


 Applicant was present when the search was conducted; he opened the door
before the officers executing the warrant had a chance to knock;


 


 Applicant was in close proximity to-and had access to-the contraband; it was
hidden in the living room of his house; 


 


 Other contraband or drug paraphernalia was present; electronic scales and
baggies were found in plain view in the kitchen; trace cocaine and prescription
medications were found in one of the bedrooms;

 Applicant had the right to possess the place where the drugs were found; the
notebook found at the house indicated that applicant, Ms. Hyke, and Mr.
Fuentes were roommates who split the bills; the columns were headed "Tony,"
"Brandi," and "Nivek";



 

 The drugs were found in an enclosed place; they were hidden in a newspaper
stacked with other newspapers in the living room;

 Applicant's conduct during the search showed consciousness of guilt; Agent
Belver testified that applicant and Mr. Fuentes, though handcuffed, "were
talking amongst themselves and laughing. They seemed to be not worried
about the current situation. They seemed to be having a good time." When
she eventually found the well hidden-cocaine, "They did stop laughing"; and

 The large quantity and high quality of the cocaine found, (47) (and the fact that
there was scant evidence that the roommates themselves were users) suggested
that cocaine was being sold from, rather than used at, the house. 


Because applicant's "mere presence" (48) was coupled with other "suspicious circumstances,"
the accomplice-witness corroboration was sufficient. (49) The strength of the non-accomplice
evidence-some seven "affirmative links"-meets the flexible harmless-error analysis for the
omission of an accomplice-witness instruction. (50) Although trial counsel's decision not to
request the instruction was unreasonable, applicant has not established that a different result
likely would have occurred had trial counsel requested it. We therefore cannot conclude that
trial counsel's failure resulted in prejudice or called for presumed prejudice under Cronic.

4. Applicant has failed to prove, by a preponderance of the evidence, that his trial
counsel was constitutionally deficient for delivering a concession-laden closing
argument.

 Applicant claims that his counsel made a constitutionally deficient closing argument
when he conceded that applicant was a drug dealer (51) and that Brandi Hyke was credible. (52) 
Applicant argues that trial counsel's closing argument "erased reasonable doubt." 

 The right to effective assistance encompasses closing arguments. (53) The type of
closing argument to make is an inherently tactical decision "based on the way a trial is
unfolding, the trial strategy employed, the experience and judgment of the defense attorney,
and other factors." (54) The points of the charge that defense counsel decides to emphasize
in argument are likewise a matter properly left to the realm of trial strategy. (55) But "counsel
has wide latitude in deciding how best to represent a client, and deference to counsel's
tactical decisions in his closing presentation is particularly important because of the broad
range of legitimate defense strategy at that stage." (56) Judicial review of an attorney's
summation is therefore highly deferential, (57) and we will second-guess that strategy only if
the attorney's actions are without any plausible basis. (58) 

 The record reflects that trial counsel's strategy in closing was to focus on how it was
impossible to know whether the specific drugs found when the search warrant was executed
were applicant's.

 This isn't a delivery case. It's a possession with intent to deliver case, and
the question that you have before you today is: Whose cocaine is it? Not did
Mr. Hatcher have cocaine at some point that day, the day before, and the day
before, and the day before. Not did Mr. Hatcher sell cocaine the day before,
the day before, the day before, and the day before that. But did he possess
this cocaine right here in my hand with the intent to deliver it? And unless
you find beyond a reasonable doubt that he possessed this cocaine, the chunky
cocaine in my hand, with the intent to deliver it, then you have no choice but
to render a not guilty verdict, as counter-intuitive as that is. 

 The record also reflects that trial counsel vacillated, in his argument, between saying
that Ms. Hyke was credible, that she was not credible, or that her credibility did not matter. (59) 

 Counsel explains in his affidavit that he argued the way that he did because "[a]nyone
that was in the courtroom would have seen that Ms. Hyke was extremely credible."

 Ms. Hyke testified about Mr. Hatcher selling drugs in the past, but she did not
testify to him selling the drugs that were in evidence. Ms. Hyke was an
extremely credible and believable witness. I could not argue to the jury that
they should believe Ms. Hyke was a liar and have any credibility with them
whatsoever. I was attempting to show the jury how they could believe Ms.
Hyke's testimony and still find Mr. Hatcher not guilty. . . . . My job at that
point was to attempt to give the jury the license and the logical steps to
believe/understand Ms. Hyke and still find Mr. Hatcher not guilty.

The trial court found, in part, that,

 By conceding that Applicant was a drug dealer, yet arguing that the State had
failed to prove Applicant possessed the specific alleged controlled substance
which was in evidence, trial counsel was trying to get the jury to take its oath
seriously. He was trying to get the jury to narrow its focus on the "cocaine
marked in a little bag with the No. 8 on it."

 Trial counsel reasonably used the unorthodox approach of conceding that
Applicant was a drug dealer because to do otherwise could have caused him
to lose credibility with the jury. The evidence against Applicant was
compelling; therefore, it was necessary for trial counsel to use the somewhat
unusual strategy of conceding obvious things, but asking the jury to focus on
the specific controlled substance that was in evidence.


 These findings are supported by the record. Counsel's summation had a "plausible
basis" in the record. Counsel acted with undivided allegiance for a client who demanded
a trial despite extensive evidence of his guilt and no plausible defense. It is hard to make
a silk purse out of a sow's ear.

 A review of counsel's entire closing argument demonstrates that he adequately
discussed the State's burden of proof, the weaknesses in the State's evidence, and the
defense theory. By candidly acknowledging applicant's status as a drug dealer, trial counsel
might have built credibility with the jury and persuaded it to focus on the relevant issue in
the case-whether applicant possessed the very drugs in evidence in this case. (60) The
argument dove-tailed nicely with his cross-examination of Agent Belver about her deliberate
decision not to have the bag containing the cocaine dusted for fingerprints. (61) The strategy
ultimately failed, but we do not judge a strategy in hindsight. (62) Trial counsel's closing
argument was actually not that unorthodox. (63) And counsel's concession that Brandi Hyke
was right about applicant being a drug dealer represents neither ineffective assistance of trial
counsel under Strickland, (64) nor "a paradigmatic example of the sort of breakdown in the
adversarial process that triggers a presumption of prejudice" under Cronic. (65)

B. Applicant has failed to prove, by a preponderance of the evidence, that
appellate counsel was constitutionally ineffective.


 Applicant contends that appellate counsel should have argued that the non-accomplice evidence was insufficient. To sustain this claim, applicant must show that "(1)
counsel's decision not to raise a particular point of error was objectively unreasonable, and
(2) there is a reasonable probability that, but for counsel's failure to raise that particular
issue, he would have prevailed on appeal." (66) 

 We have already found ample non-accomplice evidence that tends to connect
applicant to this particular offense, so there is no reasonable probability that, but for
appellate counsel's failure to raise this sufficiency issue, he would have prevailed on appeal.

IV.

 The Sixth Amendment does not require that counsel do that which is "impossible or
unethical." (67) If there is no real defense to the charge, trial counsel "cannot create one and
may disserve the interests of his client by attempting a useless charade." (68) At the same time,
even if "no theory of defense is available, if the decision to stand trial has been made,
counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt." (69) 
Counsel held the State to that burden in this case. 

 We adopt the trial court's findings of fact and deny relief on applicant's claims.


Delivered: December 14, 2011

Do Not Publish
1. Hatcher v. State, No. 11-08-00193-CR, 2009 WL 3326758 (Tex. App.--Eastland Oct. 19,
2009, no pet.).
2. Ex parte Hatcher, No. WR-73,606-01, 2010 WL 2113170 (Tex. Crim. App. May 26, 2010)
(not designated for publication); Ex parte Hatcher, No. WR-73,606-01, 2010 WL 4525028 (Tex.
Crim. App. Nov. 10, 2010) (not designated for publication).
3. The cocaine was found in a stack of newspapers, most of which were still wrapped in 
orange plastic sleeves, as if they'd never been opened.
4. Tex. Health & Safety Code § 481.112(d). 
5. Tex. Pen. Code § 12.42(c)(1); Tex. Health & Safety Code § 481.134(c). 
6. This extraneous-misconduct evidence was introduced to show intent, motive, opportunity,
and lack of mistake. Tex. R. Evid. 404(b).
7. Ex parte Chandler, 182 S.W.3d 350, 353 (Tex. Crim. App. 2005) (citing Strickland v.
Washington, 466 U.S. 668, 694 (1984)).
8. Strickland, 466 U.S. at 689 (quotation marks and citations omitted).
9. Goodspeed v. State, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (quoting Garcia v. State,
57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).
10. Strickland, 466 U.S. at 687.
11. Ex parte Martinez, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011); Thompson v. State, 9
S.W.3d 808, 813 (Tex. Crim. App. 1999).
12. Ex parte Martinez, 330 S.W.3d at 901; Busby v. State, 990 S.W.2d 263, 269 (Tex. Crim.
App. 1999).
13. Ex parte Martinez, 330 S.W.3d at 901; see also Strickland, 466 U.S. at 690.
14. Strickland, 466 U.S. at 696.
15. Evitts v. Lucey, 469 U.S. 387, 396 (1985).
16. 466 U.S. at 687.
17. 466 U.S. 648 (1984).
18. Cronic, 466 U.S. at 658-59; Cannon v. State, 252 S.W.3d 342, 349 (Tex. Crim. App. 2008)
(recognizing that, "if an appellant can demonstrate that defense counsel 'entirely fail[ed] to subject
the prosecution's case to meaningful adversarial testing,' so that there was a constructive denial of
the assistance of counsel altogether, then prejudice, because it is 'so likely,' is legally presumed.").
19. Wright v. Van Patten, 552 U.S. 120, 124 (2008) (per curiam) (internal quotation marks,
citation, and bracket omitted).
20. Bell v. Cone, 535 U.S. 685, 696-97 (2002). 
21. Ex parte McFarland, 163 S.W.3d 743, 752 (Tex. Crim. App. 2005) ("Under Cronic and
its progeny, a defendant is denied counsel not only when his attorney is physically absent from the
proceeding, but when he is mentally absent as well, i.e., counsel is asleep, unconscious, or otherwise
actually non compos mentis.").
22. See United States v. Williamson, 53 F.3d 1500, 1511 (10th Cir. 1995) (collecting cases
in which closing statements admitting guilt on the only disputed fact issues was Cronic error).
23. Ex parte Reed, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008).
24. Id.; see also Ex parte Van Alstyne, 239 S.W.3d 815, 817 (Tex. Crim. App. 2007) (per
curiam); Ex parte Simpson, 136 S.W.3d 660, 668-69 (Tex. Crim. App. 2004).
25. Ex parte Reed, 271 S.W.3d at 727; Ex parte Van Alstyne, 239 S.W.3d at 817.
26. Ex parte Reed, 271 S.W.3d at 727.
27. Ex parte Niswanger, 335 S.W.3d 611, 615 (Tex. Crim. App. 2011) (quoting Strickland,
466 U.S. at 690).
28. Id.
29. Ex parte Napper, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting Strickland, 466
U. S. at 687).
30. Ex parte Martinez, 195 S.W.3d 713, 721 (Tex. Crim. App. 2006) (quoting Wiggins v.
Smith, 539 U.S. 510, 522-23 (2003)); Salinas v. State, 274 S.W.3d 256, 261 (Tex. App.-Houston
[14 Dist.] 2008, pet. ref'd).
31. Ex parte Ybarra, 629 S.W.2d 943, 946 (Tex. Crim. App. 1982). 
32. The State had made a fifteen-year plea offer, which was five years below the minimum
punishment possible with an enhancement paragraph and a "drug-free zone" finding.
33. This statement contradicts counsel's statement at trial when he asked for a continuance,
but, given the evidence in the record, we agree with the trial judge that this is the more factually
accurate statement of counsel's actual level of preparedness.
34. Trial counsel explained that, in meeting with prosecutors, he was able to examine witness
statements and police reports that he would not have been entitled to under a formal discovery order. 
He also "had numerous conversations with [a federal investigator] investigating the same offense
as alleged in this state case." He was "able to find out a substantial amount of the state's
investigation from [him] without obtaining a discovery response from the District Attorney's Office
thereby losing the 15-year offer."
35. The trial judge specifically mentioned, among other things, that trial counsel obtained
copies of the photos, the search warrant, the property and evidence document, the witness list, the
diagram and satellite photo of applicant's house, as well as applicant's oral statements, pen packet
and rap sheet. 
36. Cronic, 466 U.S. at 656-57 n. 19.
37. Applicant does not claim that trial counsel's failure to prepare for trial was ineffective
assistance at punishment, perhaps because applicant's thirty-year sentence was at the low end of the
range available (twenty to ninety-nine years or life in prison). The punishment evidence showed that
applicant was a down-on-his-luck football player rather than a career drug dealer, and that he started
selling drugs only because he could not find a job because of his prior felony conviction.
38. A trial lawyer may perform deficiently under the first prong of Strickland by allowing the
jury to hear prejudicial and clearly inadmissible evidence. Robertson v. State, 187 S.W.3d 475, 484
(Tex. Crim. App. 2006) ("in cases like this where appellant's self-defense claim rested almost
entirely on his credibility, the weight of authority supports a holding that appellant's trial lawyer
performed deficiently under the first prong of Strickland by allowing the jury to hear prejudicial and
clearly inadmissible evidence because this evidence could serve no strategic value including
demonstrating that appellant is not a liar.").
39. Prescott v. State, 744 S.W.2d 128, 132 (Tex. Crim. App. 1988).
40. Had applicant's attorney objected to Mrs. Hatcher's unresponsive answers, the jury might
well have thought he was trying to cover up applicant's criminal history. 
41. Tex. Code Crim. Proc. art. 38.14.
42. Smith v. State, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011).
43. Joubert v. State, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007).
44. See Ex parte Zepeda, 819 S.W.2d 874, 877 (Tex. Crim. App. 1991) (per curiam) ("Given
the state of the evidence, which depended so heavily on the accomplice testimony, and given that
Pruneda and Gamboa were accomplices as a matter of law because they had been indicted, counsel
should have requested an instruction on accomplice witness testimony. This omission was an error
rendering counsel's performance deficient.").
45. Davis v. State, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) ("Because the State's case
for conviction depended heavily on the testimony of Justin Schimpf, who was an accomplice witness
as a matter of law, trial counsel should have requested an instruction on accomplice-witness
testimony, and his failure to do so rendered his performance objectively deficient").
46. Compare id. (counsel's failure to request an instruction on the law of accomplice-witness
testimony constitutes ineffective assistance of counsel according to the standard set forth in
Strickland; "the error prejudiced applicant to the extent that there is a reasonable probability that,
but for the error, the result of the proceedings would be different.").
47. Agent Pope testified that they found about $1,600 worth of powder cocaine hydrochloride. 
He said that the cocaine probably came from a "kilo brick," and was probably sold in "eight balls"
rather than single doses, making this a "medium" level operation.
48. Golden v. State, 851 S.W.2d 291, 294 (Tex. Crim. App. 1993) ("It is well-settled that mere
presence alone of a defendant at the scene of a crime is insufficient to corroborate accomplice
testimony."). See also Malone v. State, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008).
49. Brown v. State, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984).
50. See Evans v. State, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006) (setting out a non-exclusive set of possible "affirmative links" that Texas courts have recognized as sufficient, either
singly or in combination, to establish a person's possession of contraband).
51. Trial counsel described applicant as a drug dealer numerous times:



 "Is Lemmuel Hatcher a drug dealer? Is Lemmuel Hatcher a drug dealer? Well, the answer
is probably so. Okay. Probably so."
 The "evidence, most of which is uncontroverted, is, yes, [Applicant] was dealing drugs. Yes,
he's a drug dealer."
 Applicant "is the bigger of the two drug dealers."
 "Now we can assume that either Mr. Hatcher, or Mr. Fuentes, or both, more likely than not,
were going to sell pieces of [the cocaine] for money? Yes. Absolutely. That's what it looks
like. But do we know that beyond a reasonable doubt? Absolutely not."
52. "And I'm not saying that [Ms. Hyke is] lying all the time, because I don't think that she
created out of thin air 175 deliveries of cocaine. Okay. I really don't think that she pulled that out
of thin air . . . ."
53. Yarborough v. Gentry, 540 U.S. 1, 5-6, (2003) (per curiam); Bell v. Cone, 535 U.S. 685,
701-02 (2002); Herring v. New York, 422 U.S. 853, 865 (1975).
54. Taylor v. State, 947 S.W.2d 698, 704 (Tex. App.-Fort Worth 1997, pet. ref'd).
55. Tong v. State, 25 S.W.3d 707, 713 (Tex. Crim. App. 2000).
56. Yarborough v. Gentry, 540 U.S. at 1.
57. Id. at 6.
58. Bone v. State, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002) ("Under Strickland, the
defendant must prove, by a preponderance of the evidence, that there is, in fact, no plausible
professional reason for a specific act or omission.").
59. Counsel's remarks during closing argument included the following:



 "And by the way, do I consider Brandi Hyke a credible witness? No."
 "I think we need to take a look at Ms. Hyke's lack of credibility. And I'm not saying that
she's just lying all the time . . . ." 
 "I don't think Hyke's credibility, for the most part, whether or not she's lying matters that
much in this case unless she's lying about saying that 175 drug transactions existed . . . ."
 "Okay. At least consider that this is a scared young girl that got all wrapped up in this." 
 "So not with-getting past the fact that she's lying and she admitted to lying in her statement,
use a little bit of common sense here. And when numbers and the math don't add up based
on Brandi's testimony, or Ms. Hyke's testimony, keep in mind that unlike Mr. Hatcher and
unlike Mr. Fuentes she didn't do this for a living." 
60. See Yarborough v. Gentry, 540 U.S. 1, 9 (2003) (per curiam) ("The Ninth Circuit singled
out for censure counsel's argument that the jury must acquit if Gentry was telling the truth, even
though he was a 'bad person, lousy drug addict, stinking thief, jail bird.' It apparently viewed the
remark as a gratuitous swipe at Gentry's character. While confessing a client's shortcomings might
remind the jury of facts they otherwise would have forgotten, it might also convince them to put
aside facts they would have remembered in any event. This is precisely the sort of calculated risk that
lies at the heart of an advocate's discretion. By candidly acknowledging his client's shortcomings,
counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in
the case.").
61. In the cross-examination of the agent, counsel stated, "If Brandi Hyke's prints are on there
or if Jose Feuentes' prints are on there, well, then I'm going to say, 'It's not my client.' Lemmuel
Hatcher's prints are not on there. But not printing the bag you get to pursue whoever you want in
this case regardless of who the drugs actually belong to or regardless of who actually possesses the
drugs, that by not printing them you leave your options open to pursue everybody . . . ."
62. Goodspeed v. State, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); Saylor v. State, 660
S.W.2d 822, 823-24 (Tex. Crim. App. 1983) (Defense counsel closing argument-"I'm not fool
enough, and I know you're not fool enough either for me to stand up here and tell you that he's not
guilty of theft because he is. And he's guilty of theft between $200 and $10,000 and that's what they
proved up, a value of over $200 but less than $10,000."-was reasonable where appellant was caught
with stolen goods; "since the jury was not charged on the offense of theft, defense counsel was
arguing that appellant could not be convicted in this case. Defense counsel was merely emphasizing
that possession of stolen goods alone was not enough to convict appellant for burglary. The fact that
this trial strategy was not successful does not mean that counsel was ineffective.").
63. See note 64, infra; see generally, Gregory G. Sarno, Annotation, Adequacy of Defense
Counsel's Representation of Criminal Client Regarding Argument, 6 A.L.R. 4th 16 §§ 20-21
(collecting cases addressing whether defense counsel's making an unfavorable disclosure or
concession during closing argument supports a finding of ineffective assistance).
64. See Hathorn v. State, 848 S.W.2d 101, 118 (Tex. Crim. App. 1992) (rejecting contention
that capital murder trial counsel relieved the State of a major portion of its burden of proof when he
told the jurors that appellant was guilty of murder: "defense counsel's conduct in conceding
appellant's guilt in an apparent attempt to get the jury to find appellant guilty of a lesser offense can
reasonably be explained as trial tactic. Although it was apparently unsuccessful, it was logical when
the overwhelming strength of the State's case was considered. We do not believe that appellant has
met his burden of proof as to either of the Strickland prongs with this example."); Brown v. State,
866 S.W.2d 675, 681 (Tex. App.-Houston [1st Dist.] 1993, pet. ref'd) (counsel was not ineffective
for conceding, in closing argument, that defendant was a "dope head"; counsel urged the jury to
consider whether defendant was guilty of only some lesser drug offense, challenged credibility of
undercover officer's testimony, and argued that defendant should be helped as user rather than
convicted as pusher). See also United States v. Short, 181 F.3d 620, 624-25 (5th Cir. 1999) (defense
counsel's closing argument, admitting defendant was in the drug trade, did not amount to ineffective
assistance of counsel; evidence was overwhelming that defendant was involved in the drug trade;
counsel took reasonable strategic approach of trying to establish his credibility with the jury and
enhance the possibility that the jury would accept his arguments on the more serious kingpin and
murder counts); United States v. Williamson, 53 F.3d 1500, 1511 (10th Cir. 1995) (counsel's closing
statements acknowledging defendant's admission of involvement in distributing drugs to undercover
officers did not amount to admission of guilt of involvement in drug conspiracy and thus did not
show ineffective assistance of counsel); United States v. Simone, 931 F.2d 1186, 1195 (7th Cir.
1991) ("concessions by Bosko's counsel [that defendant was a cocaine dealer] were bold and blatant.
However, our examination of the trial transcript reveals that the admitted facts arose from
indisputable evidence and credible testimony. And the concessions made by Mr. Muslin about the
defendant's activities concerned the drug trafficking that Bosko did only on his own or with Amanda
Roland, his girlfriend, who entered a guilty plea. The attorney vigorously contested the most serious
charges, such as conspiracy and continuing enterprise. We find this approach to be a logical trial
strategy"); Kelly v. United States, 820 F.2d 1173, 1176 (11th Cir.1987) (given that defendant was
arrested on board a boat loaded with marijuana, counsel's admission of guilt on importation charges
was part of reasonable strategy to persuade jury of innocence on distribution charge).
65. See Williamson, 53 F.3d at 1511 (collecting cases in which closing statements admitting
guilt on the only fact issues in dispute amounted to Cronic error).
66. Ex parte Miller, 330 S.W.3d 610, 623-24 (Tex. Crim. App. 2009) (internal quotation marks
and footnotes omitted).
67. Cronic, 466 U.S. at 656 n.19.
68. Id.
69. Id.